**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____

|  |  |  |
|---|---|---|
| **SHELLY ALICIA LEROY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:23-cv-783** |
| | ) | |
| **EQUIFAX INFORMATION SERVICES, LLC,** | ) | |
| **SERVE:  Corporation Service Company, Reg. Agent** | ) | |
| **100 Shockoe Slip** | ) | |
| **2nd Floor** | ) | |
| **Richmond, VA  23219** | ) | |
| | ) | |
| **EXPERIAN INFORMATION SOLUTIONS, INC.,** | ) | |
| **SERVE:  David N. Anthony, Reg. Agent** | ) | |
| **TROUTMAN SANDERS, LLP** | ) | |
| **1001 Haxall Point** | ) | |
| **Richmond, VA 23219** | ) | |
| | ) | |
| **TRANS UNION, LLC,** | ) | |
| **SERVE:  Corporation Service Company, Reg. Agent** | ) | |
| **100 Shockoe Slip** | ) | |
| **2nd Floor** | ) | |
| **Richmond, VA 23219** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,** | ) | |
| **SERVE:  CT Corporation System, Reg. Agent** | ) | |
| **4701 Cox Road** | ) | |
| **Suite 285** | ) | |
| **Glen Allen, VA 23060-6808** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**<u>COMPLAINT</u>**

COMES NOW the Plaintiff, SHELLY ALICIA LEROY, by counsel, and for her complaint against each of the Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1.      Defendants EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION, LLC, and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION have violated Plaintiff's civil rights under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA") by improperly reporting derogatory information regarding Plaintiff's mortgage account with JPMorgan Chase Bank, National Association and student loan account with Wells Fargo Bank, National Association

2.      Defendants continued to report inaccurate and derogatory information on Plaintiff's credit regarding Plaintiff's mortgage account even after receiving from Plaintiff multiple disputes and correspondence requesting that the inaccurate derogatory reporting be corrected.

3.      Defendants' violations include failing to properly investigate Plaintiff's disputes and failing to maintain reasonable procedures to assure maximum possible accuracy of the information in Plaintiff's credit files. Through these failures, and by improperly reporting on Plaintiff's credit, Defendants have violated Plaintiff's rights under the FCRA. Accordingly, Plaintiff seeks actual damages, attorney's fees and costs, and punitive damages for Defendants' willful violations of the FCRA.

**II.**

**JURISDICTION AND VENUE**

4.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2).

## III.

### PARTIES

6.     Plaintiff SHELLY ALICIA LEROY ("Ms. LeRoy" or "Plaintiff") is a natural person and "consumer" as defined by § 1681a(c) of the FCRA. Ms. LeRoy resides in County of Hanover, Virginia..

7.     Defendant EQUIFAX INFORMATION SERVICES, LLC ("Equifax") is a limited liability company formed in Georgia and authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

8.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing to third parties information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d).

9.     Equifax disburses consumer reports to third parties, under contract, for monetary compensation.

10.     Defendant EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian") is a corporation formed in Ohio and authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

11.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing to third parties information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d).

12.     Experian disburses consumer reports to third parties, under contract, for monetary compensation.

13.     Defendant TRANS UNION, LLC ("Trans Union") is a limited liability company formed in Delaware and authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

14.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing to third parties information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d).

15.     Trans Union disburses consumer reports to third parties, under contract, for monetary compensation.

16.     Defendant JPMORGAN CHASE BANK, NATIONAL ASSOCIATION ("Chase") is a national banking association authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia. Chase conducts business in the Commonwealth of Virginia, with consumers in Virginia.

17.     With respect to the accounts it reported on Plaintiff's credit, Chase is a "furnisher" as governed by the FCRA.

**IV.**

**F<small>ACTS</small>**

***Background***

18.     On or about August 2, 2006, Plaintiff executed a deed of trust, which encumbered real estate in Mechanicsville, VA (the "Mechanicsville Property") and secured payment of a promissory note payable to Chase Bank USA, N.A. (the "Mortgage").

19.     On or about August 3, 2006, Plaintiff obtained a student loan agreement from Wells Fargo Education Financial Services, a division of Wells Fargo Bank, N.A. (the "Student Loan").

20.     On May 22, 2019, Plaintiff filed a voluntary petition for relief and her Individual Schedules under Chapter 13 of the United States Bankruptcy Code in the Eastern District of Virginia, Richmond Division, Case No. 19-32722-KRH. Relief was ordered.

21.     On May 23, 2019, Plaintiff filed in her bankruptcy case a Chapter 13 Plan and Related Motions (the "Plan"). With respect to the Mortgage and Student Loan, the terms of the Plan provided for Plaintiff to cure any pre-petition default via payments to the Chapter 13 trustee while maintaining direct post-petition payments, in accordance with 11 U.S.C. § 1322(b)(5).

22.     On July 17, 2019, Wells Fargo Bank, N.A. ("Wells Fargo") filed its proof of claim for the Student Loan.

23.     On July 30, 2019, Chase filed its proof of claim for the Mortgage.

24.     On August 1, 2019, the bankruptcy court entered an order confirming the Plan.

25.     On June 12, 2020, the bankruptcy court granted Plaintiff permission to sell the Mechanicsville Property.

26.     On July 27, 2020, Plaintiff filed in her bankruptcy case a Chapter 13 Plan – Modified and Related Motions (the "Modified Plan"). With respect to the Mortgage, the terms of the Modified Plan provided for the Plaintiff to surrender her interest.  The Modified Plan did not alter the treatment of the Student Loan in Plaintiff's bankruptcy.

27.     On September 11, 2020, the bankruptcy court entered an order confirming the Modified Plan.

28. On July 26, 2021, the trustee of Plaintiff's Chapter 13 bankruptcy estate filed a report with the court, confirming Plaintiff had completed all payments required under her Plan.

29. On September 1, 2021, the bankruptcy court entered a discharge in Plaintiff's bankruptcy case, pursuant to 11 U.S.C. § 1328 of the Bankruptcy Code (the "Discharge").

30. On October 26, 2021, the trustee of Plaintiff's Chapter 13 bankruptcy estate filed a Chapter 13 Trustee Final Report and Account.

31. Plaintiff's Student Loan account was excluded from the Discharge pursuant to 11 U.S.C. § 523(a) and § 1328(a)(1).

32. The Mortgage account was included in Plaintiff's Discharge.

33. After receiving her Discharge, Plaintiff hoped and believed her credit problems were behind her and that, based on her faithful completion of her obligations to obtain her Discharge, she would be allowed to receive a fresh start from her indebtedness and rebuild her credit.

### *Inaccurate and Derogatory Reporting by Equifax, Experian, and Trans Union*

34. In or around April 2022, Plaintiff requested and received copies of her credit disclosures from Equifax, Experian, and Trans Union, each of which was dated April 5, 2022 (collectively, the "April 2022 Disclosures").

35. The April 2022 Disclosures revealed that Equifax, Experian, and Trans Union were each reporting inaccurate and derogatory information regarding the Student Loan in a Wells Fargo EFS trade Line (the "Wells Fargo Trade Line") or the Mortgage in a JPMorgan Chase Bank trade Line (the "Chase Trade Line").

36. Specifically, Equifax was inaccurately reporting the Mortgage in the Chase Trade Line with comments referencing "Bankruptcy petition" and inaccurately reporting the Student

Loan in the Wells Fargo Trade Line with a status of "Included in Chapter 13", date of first delinquency of April 1, 2019, delinquency first reported of May 1, 2019, and comments referencing "the bankruptcy.

37.     Equifax's reporting in the Chase Trade Line was inaccurate because the Mortgage account was included in Plaintiff's bankruptcy Discharge.  Additionally, Equifax's reporting in the Wells Fargo Trade Line was inaccurate because the Student Loan account was not included in or otherwise affected by Plaintiff's bankruptcy Discharge, nor did the account become delinquent in April or May of 2019.

38.     The April 2022 Disclosures revealed that Experian was inaccurately reporting the account status of the Mortgage as "Petition for Chapter 13 Bankruptcy".

39.     Experian's reporting in the Chase Trade Line was inaccurate with respect to the Mortgage because that account was included in Plaintiff's bankruptcy Discharge.

40.     The April 2022 Disclosures revealed that Trans Union was inaccurately reporting the Student Loan with remarks of "Chapter 13 Bankruptcy".

41.     Trans Union's reporting in the Wells Fargo Trade Line was because the Student Loan account was not included in or otherwise affected by Plaintiff's bankruptcy Discharge.

### *Failure by Equifax, Experian, and Trans Union to Investigate Plaintiff's Disputes*

**Plaintiff's April 2022 Dispute Letters**

42.     On April 13, 2022, Plaintiff sent letters, each dated April 13, 2022, via certified mail to Equifax, Experian, Trans Union, respectively, to dispute the inaccurate and derogatory information set forth in the April 2022 Disclosures (the "April 2022 Dispute Letters").

43.     Plaintiff paid to the United States Postal Service the costs associated with mailing the April 2022 Dispute Letters via certified mail.

44.     In her respective April 2022 Dispute Letters to Equifax, Experian, and Trans Union, Plaintiff disputed the inaccurate and derogatory information each of those Consumer Reporting Agencies was reporting with respect to the Mortgage in the Chase Trade Line and the Student Loan in the Wells Fargo Trade Line.

**Responses to Plaintiff's April 2022 Dispute Letters**

45.     On or about April 20, 2022, Equifax received the April 2022 Dispute Letter that Plaintiff sent to Equifax.

46.     In response to Plaintiff's April 2022 Dispute Letter to Equifax, Equifax mailed to Plaintiff its reinvestigation results, dated May 10, 2022.

47.     Equifax's May 10, 2022 reinvestigation results revealed that Equifax failed to correct the information being reported in the Chase Trade Line and began reporting the following inaccurate and derogatory information: a status of "Account closed; was over 120 Days Past Due", Additional Information of "Account Paid For Less Than Full Balance" and "Account Paid After Foreclosure Started", and a Balloon Pay Amount of $43,325.  Equifax's updated reporting was still inaccurate because the Mortgage was discharged in Plaintiff's bankruptcy.  Equifax failed to mention the Wells Fargo Trade Line in the reinvestigation results and failed to correct the Student Loan account reporting.

48.     On or about April 19, 2022, Experian received the April 2022 Dispute Letter that Plaintiff sent to Experian.

49.     In response to Plaintiff's April 2022 Dispute Letter to Experian, Experian emailed to Plaintiff its reinvestigation results, dated June 2, 2022.

50.     Experian's June 2, 2022 reinvestigation results revealed that Experian failed to correct the information being reported in the Chase Trade Line and began reporting an inaccurate

and derogatory account status of "Paid in settlement. Balloon payment of $43,325 due Jan 2053". Experian's updated reporting was still inaccurate because the Mortgage was discharged in Plaintiff's bankruptcy.

51.     On or about April 15, 2022, Trans Union received the April 2022 Dispute Letter that Plaintiff sent to Trans Union.

52.     On or about April 18, 2022, Plaintiff received a letter from Trans Union refusing to conduct an investigation in response to Plaintiff's April 2022 Dispute Letter.

53.     In or around June 2022, Plaintiff obtained an updated copy of her Trans Union credit disclosure, dated June 2, 2022, which revealed that Trans Union failed to correct the reporting in the Chase Trade Line and began reporting the following inaccurate and derogatory information: an account status of "Account 120 Days Past Due Date", remarks of "Settled-Less Than Full Balance" and "Foreclosure Started", and a Payment History to showing "Account 120 or more days late" during the pendency of Plaintiff's bankruptcy for July 2020. The June 2, 2022 credit disclosure also revealed that Trans Union failed to update the reporting of the Student Loan in the Wells Fargo Trade Line.

**Plaintiff's June 2022 Dispute Letters**

54.     On June 8, 2022, Plaintiff sent a second set of letters, each dated June 8, 2022, along with supporting documentation, via certified mail to Equifax, Experian, and Trans Union, respectively, to dispute the inaccurate and derogatory information still being reported on her credit (the "June 2022 Dispute Letters").

55.     Plaintiff paid to the United States Postal Service the costs associated with mailing the June 2022 Dispute Letters via certified mail.

56.     In her respective June 2022 Dispute Letters to Equifax, Experian, and Trans Union, Plaintiff again disputed the inaccurate and derogatory information each of those Consumer Reporting Agencies was continuing to report with respect to the Mortgage in the Chase Trade Line and the Student Loan in the Wells Fargo Trade Line.

57.     In support of her assertions, Plaintiff enclosed with each of her June 2022 Dispute Letters to Equifax, Experian, and Trans Union copies of her Modified Plan and Discharge that were filed in Plaintiff's bankruptcy.

**Responses to Plaintiff's June 2022 Dispute Letters**

58.     On or about June 16, 2022, Equifax received the June 2022 Dispute Letter that Plaintiff sent to Equifax.

59.     In response to Plaintiff's June 2022 Dispute Letter to Equifax, Equifax mailed to Plaintiff its reinvestigation results, dated June 18, 2022.

60.     Equifax's June 18, 2022 reinvestigation results revealed that Equifax failed to correct any of the information that Plaintiff disputed regarding the Chase Trade Line. Equifax updated the Student Loan in the Wells Fargo Trade Line to show as "Account Transferred or Sold" with no bankruptcy indicators.

61.     On or about June 15, 2022, Experian received the June 2022 Dispute Letter that Plaintiff sent to Experian.

62.     In response to Plaintiff's June 2022 Dispute Letter to Experian, Experian emailed to Plaintiff its reinvestigation results, dated July 13, 2022.

63.     Experian's July 13, 2022 reinvestigation results revealed that Experian failed to update the information being reported in the Chase Trade Line to reflect an account status of discharged.  Experian's July 13, 2022 reinvestigation results also show that Experian updated

reporting of the Student Loan in the Wells Fargo Trade Line to show an inaccurate status of "Petition for Chapter 13 Bankruptcy".

64.     On or about June 14, 2022, Trans Union received the June 2022 Dispute Letter that Plaintiff sent to Trans Union.

65.     In response to Plaintiff's June 2022 Dispute Letter to Trans Union, Trans Union mailed to Plaintiff its reinvestigation results, dated June 24, 2022.

66.     Trans Union's June 24, 2022 reinvestigation results revealed that Trans Union failed to update the Student Loan information being reported in the Wells Fargo Trade Line. Trans Union was still misreporting the Student Loan with a status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy". Trans Union completely failed to address Plaintiff's dispute of the Chase Trade Line.

**Plaintiff's August 2022 Dispute Letters**

67.     On August 9, 2022, Plaintiff sent a third set of letters, each dated August 7, 2022, along with supporting documentation, via certified mail to Equifax, Experian, and Trans Union, respectively, to dispute the inaccurate and derogatory information still being reported on her credit (the "August 2022 Dispute Letters").

68.     Plaintiff paid to the United States Postal Service the costs associated with mailing the August 2022 Dispute Letters via certified mail.

69.     In her respective August 2022 Dispute Letters to Equifax, Experian, and Trans Union, Plaintiff again disputed the inaccurate and derogatory information each of those Consumer Reporting Agencies was continuing to report with respect to the Mortgage in the Chase Trade Line and the Student Loan in the Wells Fargo Trade Line.

70.     In support of her assertions, Plaintiff enclosed with each of her August 2022 Dispute Letters to Equifax, Experian, and Trans Union copies of her Schedules, her Modified Plan, and her Discharge that were filed in Plaintiff's bankruptcy case. Also, Plaintiff enclosed a copy of the Wells Fargo Proof of Claim that was filed in Plaintiff's bankruptcy with the August 2022 Experian and Trans Union Dispute Letters.

**Responses to Plaintiff's August 2022 Dispute Letters**

71.     On or about August 12, 2022, Equifax received the August 2022 Dispute Letter that Plaintiff sent to Equifax.

72.     In response to Plaintiff's August 2022 Dispute Letter to Equifax, Equifax mailed to Plaintiff its reinvestigation results, dated August 18, 2022.

73.     Equifax's August 18, 2022 reinvestigation results revealed Equifax had failed to update the Mortgage account in the Chase Trade Line.  Further, upon reviewing the disclosure that was included in the reinvestigation results, Equifax had inaccurately updated the Student Loan account in the Wells Fargo Trade Line to report the status of "Included In Wage Earner Plan" and Additional Information remarks of "Bankruptcy Chapter 13" and "Bankruptcy Petition".

74.     On or about August 12, 2022, Experian received the August 2022 Dispute Letter that Plaintiff sent to Experian.

75.     Plaintiff does not have any record of receiving any reinvestigation results from Experian in response to her August 2022 Dispute Letter.

76.     In or around September 2022, Plaintiff obtained an updated copy of her Experian credit disclosure, dated September 26, 2022, which revealed that Experian was still reporting an inaccurate account status of "Paid in settlement. Balloon payment of $43,325 due Jan 2053" and

a "Foreclosure proceedings started" status in the Payment History section for April 2022 regarding the Mortgage in the Chase Mortgage Trade Line.  For the Student Loan, Experian was still misreporting the status as "Petition for Chapter 13 Bankruptcy" in the Wells Fargo Trade Line.

77.     On or about August 15, 2022, Trans Union received the August 2022 Dispute Letter that Plaintiff sent to Trans Union.

78.     Plaintiff does not have any record of receiving any reinvestigation results from Trans Union in response to her August 2022 Dispute Letter.

79.     In or around September 2022, Plaintiff obtained an updated copy of her Trans Union credit disclosure, dated September 26, 2022, which revealed that Trans Union was still reporting an inaccurate account status of "Account 120 Days Past Due Date" and remarks of "Settled-Less Than Full Balance" and "Foreclosure Started" regarding the Mortgage in the Chase Trade Line.  For the Student Loan, Trans Union was still reporting the status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy" in the Wells Fargo Trade Line.

80.     Upon information and belief, Equifax, Experian, and Trans Union continue to report the inaccurate information that Plaintiff disputed regarding the Mortgage in the Chase Mortgage Trade Line and the Student Loan in the Wells Fargo Trade Line.

13

*Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive*
*Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

81.　　"Congress enacted FCRA in 1970 out of concerns about abuses in the consumer

reporting industry. See S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement

of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan) . . . In enacting FCRA Congress

adopted a variety of measures designed to ensure that agencies report accurate information."

Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition

of the critical role that CRAs play in the credit markets and the serious consequences borne by

consumers because of inaccurate information disseminated in consumer credit reports prepared

by CRAs, Congress placed on a CRA what can only be described as very high legal duties of

care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." Burke v.

Experian Info. Sols., Inc., No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar.

18, 2011).

82.　　"Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a
consumer report it shall follow reasonable procedures to assure maximum possible
accuracy of the information concerning the individual about whom the report
relates."

*Burke*, 2011 WL 1085874, at *4.

83.　　"The . . . FCRA . . . was crafted to protect consumers from the transmission of

inaccurate information about them, and to establish credit reporting practices that utilize

accurate, relevant, and current information in a confidential and responsible manner." Guimond

v. TransUnion Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These

consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation

of this remedial statute must reflect those objectives." Cortez v. TransUnion, LLC, 617 F.3d 688, 706 (3d Cir. 2010) (quoting Guimond, 45 F.3d at 1333).

84.     Over a decade ago, the Third Circuit apprised Trans Union specifically and Experian and Equifax generally of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as TransUnion did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> TransUnion remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that TransUnion did not exercise sufficient care here.

*Cortez v. TransUnion*, LLC, 617 F.3d 688, 709–10 (3d Cir. 2010).

85.     Section 1681i(a) requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through a dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

86.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991).

87.     It has long been the law that a CRA, such as Equifax, Experian and Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g., Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

88.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. TransUnion Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that TransUnion's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." Id.

89.     Further, as the CRA Defendants are aware, courts have held that even though the

term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct

a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is

"central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)].
> For example, Section 1681e(b) requires (1) "reasonable procedures" that (2)
> "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or
> certain: put beyond all doubt." Webster's Third New International Dictionary 133
> (1993). "Maximum" means the "greatest in quantity or highest degree attainable"
> and "possible" means something "falling within the bounds of what may be done,
> occur or be conceived . . . ." Id. at 1396, 1771. It is difficult to imagine how
> "maximum possible accuracy" could be guaranteed without an adequate
> investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation,"
> necessarily implying that an "investigation" was required to have been performed
> in the first instance.

Burke, 2011 WL 1085874, at *4.

90.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that
> may indicate systematic problems (by virtue of information from consumers, report
> users, from periodic review of its reporting system, or otherwise), it must review
> its procedures for assuring accuracy and take any necessary steps to avoid future
> problems. Similarly, it should establish procedures to avoid reporting information
> from its furnishers that appears implausible or inconsistent.

Federal Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING

ACT (July 2011), at 67.[1]

---

[1]   *Available   at*   https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–
fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

### *The CRA Defendants Did Not and Do Not*
### *Conduct Any Investigation of Most Consumer Disputes*

91.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

92.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

93.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, scans them into a batch of other disputes.

94.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

95.     Both Teleperformance and the Experian affiliate use low-wage employees to work quickly to process consumer dispute letters received, skimming the letters, and selecting one or a

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

96.    Teleperformance agents and Experian Chile are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

97.    The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

98.    In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect?).  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian.  It gets sent to Defendants' creditor customer (such as Chase) for their sole review and consideration.

99.    Both Equifax and Trans Union have taken the position in other litigation that it has no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

100.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

101.     Regardless of whether these statements are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

102.     Equifax, Trans Union and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

***Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty of Furnishers Such as Chase to Perform a Detailed and Systematic Investigation of Consumer Dispute***

103.     Today, furnishers such as Chase, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

104.     Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. The furnisher further must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

105.     "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

106.    Additionally, Chase has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting.   *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *The CRA Defendants Forwarded Plaintiff's Disputes to Chase, Who Did Nothing*

107.    Upon information and belief, after receipt of each of Plaintiff's letters disputing information reported in the Chase Trade Line, Equifax, Experian, and Trans Union all forwarded Plaintiff's disputes to Chase.

108.    Upon information and belief, Chase utilized the e-OSCAR automated system ("e-OSCAR") and Automated Consumer Dispute Verification ("ACDV") procedures to process Plaintiff's disputes.

109.    Upon information and belief, Chase was provided notice of all of Plaintiff's disputes to Equifax, Experian, and Trans Union and, despite receiving these notices, failed and refused to investigate and correct the inaccurate information it was furnishing regarding Plaintiff's Mortgage.

110.    Over twenty years ago, the Consumer Data Industry Association (the "CDIA") created a standardized, electronic format named "Metro 2," for furnishers of information (like Chase) to use in reporting to the Nationwide Consumer Reporting Agencies (the "CRA's," which include Equifax, Experian, and Trans Union).[3] Furnishers receive training on how to properly implement the Metro 2 standards, which are laid out in the CDIA's Credit Reporting Resource Guide.

111.    According to the standards in the Credit Reporting Resource Guide, upon Plaintiff's successful completion of her bankruptcy, Chase should have reported the status of the Mortgage account as discharged.[4]

112.    Chase was aware of the correct way for Plaintiff's Mortgage account to be reported on her credit following the completion of her bankruptcy case, but Chase chose to not furnish the Mortgage account information to Equifax, Experian, and Trans Union according to the standards laid out in the Credit Reporting Resource Guide. Instead, even after receiving notice of all of Plaintiff's disputes, Chase chose to furnish inaccurate information to Equifax, Experian, and Trans Union—indicating that the Mortgage was not included in or otherwise affected by Plaintiff's bankruptcy Discharge.

113.    Because Chase furnished inaccurate and derogatory information to Equifax, Experian, and Trans Union, and then chose not to correct the inaccurate information it was furnishing—despite receiving notice of Plaintiff's disputes—inaccurate and derogatory information continues to be reported on Plaintiff's credit.

---

[3] CFPB, KEY DIMENSIONS & PROCESSES IN THE U.S. CREDIT REPORTING SYSTEM (Dec. 2012), *available at* http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf.
[4] Consumer Data Industry Association, Credit Reporting Resource Guide 6-28 (2021).

**Recent Publication of Inaccurate Information on Plaintiff's Credit File**

114.    Plaintiff has applied for credit on several occasions since disputing the inaccurate and derogatory information appearing in her credit files. In connection with Plaintiff's credit applications, Equifax, Experian, and Trans Union have furnished to various creditors consumer reports that contained inaccurate and derogatory information concerning Plaintiff. Upon information and belief, several of these creditors have relied upon inaccurate information contained in those consumer reports in making their decision regarding extending credit to Plaintiff.

115.    Through their violations of Plaintiff's rights under the FCRA, Equifax, Experian, Trans Union, and Chase have all caused damage to Plaintiff.

*Plaintiff Suffered Actual Harm*

116.    Equifax, Trans Union and Experian continue to report inaccurate and derogatory information about the Chase Mortgage account and Wells Fargo Student Loan account on Plaintiff's credit reports, despite being notified that this information was false.

117.    Chase refuses to correct the information it is reporting about the Mortgage account, even after receiving copies of multiple disputes from Plaintiff detailing how the Mortgage should be reported.

118.    Plaintiff attempted to resolve these matters with Defendants and yet Defendants continue to harm her credit with false and derogatory information.

119.    As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

        a.    Stress associated with attempting to resolve this matter, resulting in anxiety, loss of appetite, back and shoulder pain, loss of concentration, loss of

privacy, headaches, nausea, insomnia, rumination, changes in weight, irritability, humiliation, embarrassment, and harm to her relationships.

b.  Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

c.  Loss of time attempting to correct the inaccuracies;

d.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

### *Defendants' Conduct was Willful*

120.  The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

121.  Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

122.  As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

24

123.   The CRA Defendants have received many thousands of disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

124.   Just in federal court alone, during the past decade the creditor-furnishers disputed by Plaintiff have had to defend approximately 2,400 consumer credit lawsuits altogether (of those, Chase has had to defend approximately 496 while Wells Fargo had to defend approximately 1,905 consumer credit lawsuits).

125.   In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

126.   The CRA Defendants knew or should have known of this litigation history.

127.   The CRA Defendants use and have access to PACER to investigate and monitor such consumer complaints.

128.   The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

129.   Each Defendant regularly receives unredacted consumer dispute details from this database.

130.   Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

131.   Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

132.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

133.     Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

134.     Just in the last 12 months alone, Equifax, Trans Union and Experian have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

135.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

136.     Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74

(D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

137.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

138.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

139.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

140.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[5]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

141.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

142.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading egal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[6]

---

[5]    *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[6] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

143.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

144.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

145.    Proportionately similar, Chase has also been sued in federal court hundreds of times for consumer credit claims by consumers – most involving alleged violations of the FCRA.

146.    Further, Chase has received over 6,000 consumer complaints from the CFPB regarding its credit reporting errors.

147.    Chase had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

148.    Chase had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

149.    Chase had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

150.    Chase had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

151.    Chase had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

152.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

153.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## V.

### CLAIMS FOR RELIEF

**COUNT ONE:**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681e(b) (EQUIFAX, EXPERIAN, AND TRANS UNION)**

154.    Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

155.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports they each furnished and maintained concerning Plaintiff.

156.    As a result of Equifax's, Experian's, and Trans Union's violations of 15 U.S.C. § 1681e(b), inaccurate and derogatory information was reported on Plaintiff's credit and was published to third parties.

157.    As a result of Equifax's, Experian's, and Trans Union's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, loss of time, anxiety, loss of appetite, back and shoulder pain, loss of concentration, loss of privacy, headaches, nausea, insomnia, rumination, changes in weight, irritability, humiliation, embarrassment, and harm to her relationships.

158.    The violations by Equifax, Experian, and Trans Union were willful, rendering Equifax, Experian, and Trans Union liable for punitive damages in an amount to be determined

by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

159.    Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT TWO:**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681i(a) (EQUIFAX, EXPERIAN, AND TRANS UNION)**

160.    Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

161.    After Plaintiff disputed the inaccurate information on her respective consumer reports, Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct reasonable reinvestigations to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiff's credit file.

162.    After Plaintiff disputed the inaccurate information in her respective consumer reports, Equifax and Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct any reinvestigation at all to determine whether the disputed information was inaccurate. Instead of conducting their own investigations of Plaintiff's disputes, as the FCRA requires consumer reporting agencies to do, Equifax and Trans Union each chose to delegate their investigation responsibilities to Teleperformance, a third party over which neither Equifax nor Trans Union are able exert control. Equifax's and Trans Union's delegation of their investigation duties to a third party who is not their agent resulted in Plaintiff's disputes to Equifax and Trans Union not

being investigated by the consumer reporting agency to whom Plaintiff submitted her dispute letters.

163.    After Plaintiff disputed the inaccurate information in her respective consumer reports, Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider <u>all</u> relevant information submitted by Plaintiff.

164.    After Plaintiff disputed the inaccurate information in her respective consumer reports, Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the items of information upon a lawful reinvestigation.

165.    After it received Plaintiff's April 2022 Dispute Letter, Trans Union violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

166.    After it received Plaintiff's August 2022 Dispute Letters, Experian and Trans Union both violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

167.    As a result of Equifax's, Experian's, and Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, loss of time, anxiety, loss of appetite, back and shoulder pain, loss of concentration, loss of privacy, headaches, nausea, insomnia, rumination, changes in weight, irritability, humiliation, embarrassment, and harm to her relationships.

168.    The violations by Equifax, Experian, and Trans Union were willful, rendering Equifax, Experian, and Trans Union liable for punitive damages in an amount to be determined

by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans

Union were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

169.    Plaintiff is entitled to recover actual damages, punitive damages, costs, and

attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the

Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT THREE:**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1) (CHASE)**

170.    Plaintiff realleges and incorporates all other factual allegations set forth in this

complaint.

171.    On one or more occasions within the past two years, by example only and without

limitation, Chase violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly

investigate Plaintiff's disputes.

172.    On one or more occasions within the past two years, by example only and without

limitation, Chase violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant

information provided by Equifax, Experian, and Trans Union in connection with Plaintiff's

disputes.

173.    On one or more occasions within the past two years, by example only and without

limitation, Chase violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)(E), by failing

to modify the representations about the Mortgage account within Plaintiff's credit files with

Equifax, Experian, and Trans Union to accurately reflect Plaintiff's bankruptcy Discharge.

174.    The law in this District, the Fourth Circuit, and even nationally was long ago

articulated to require a detailed and searching reinvestigation by a creditor when it receives a

consumer's FCRA dispute through a CRA. See *Johnson v. MBNA*, 357 F.3d 426 (4th Cir. 2004).

175.    Chase was aware of the *Johnson v. MBNA* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

176.    Chase understood the nature of Plaintiff's disputes when it received them from Equifax, Experian, and Trans Union.

177.    Chase has been sued numerous times for its alleged failures to conduct lawful FCRA reinvestigations.

178.    Upon information and belief, the procedures that Chase's employee(s) or agent(s) followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that chase intended its employees or agents to follow.

179.    Upon information and belief, Chase's employee(s) or agent(s) did not make a mistake in the way in which they followed Chase's procedures when they received, processed and responded to the respective ACDVs from Equifax, Experian, and Trans Union.

180.    As a result of Chase's violations of 15 U.S.C. § 1681s-2(b)(1), inaccurate and derogatory information continues to be reported on Plaintiff's credit, and Plaintiff has suffered actual damages, including, but not limited to loss of credit, postage costs, loss of time, anxiety, loss of appetite, back and shoulder pain, loss of concentration, loss of privacy, headaches, nausea, insomnia, rumination, changes in weight, irritability, humiliation, embarrassment, and harm to her relationships.

181.    The violations by Chase were willful, rendering Chase liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Chase was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

182.     Plaintiff is entitled to recover actual damages, punitive damages, costs, and

attorney's fees from Chase in an amount to be determined by the Court, pursuant to

15 U.S.C. § 1681n and § 1681o.

## VI.

### DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)     Award Plaintiff actual and punitive damages for violations of the FCRA by

Equifax, Experian, Trans Union, and Chase;

(2)     Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**SHELLY ALICIA LEROY**

By:

/s/ Mark C. Leffler
Leonard A. Bennett, VSB #37523
Emily Connor Kennedy, VSB #83889
Mark C. Leffler, VSB #40712
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email:  emily@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*